UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No. 1:19-cr-0229-RLY-KMB |
| MOYAD DANNON, | ) | -02 |
| | ) | |
| *Defendant*. | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by counsel, Zachary A. Myers, United States

Attorney for the Southern District of Indiana, and Matthew J. Rinka, Assistant United States

Attorney, and respectfully submits this Sentencing Memorandum in the captioned cause.

I.    **Procedural Background**

On June 9, 2023, defendant MOYAD Dannon pled guilty to one count of Attempting to

Provide Material Support and Resources to a Foreign Terrorist Organization, in violation of 18

U.S.C. §§ 2 and 2339B(a)(1)[1].  The offense is punishable by a maximum sentence of not more

than 20 years' imprisonment, a fine of not more than $250,000, and a term of supervised release

of any term of years, including life.  In exchange for defendant's plea of guilty, the government

agreed to dismiss several additional charges following sentencing in this cause.

On July 18, 2023, the U.S. Probation Office filed an initial Presentence Investigation

Report ("PSIR").  (Docket No. 167.)  In that report, the Probation Office concluded that

---

[1] On March 11, 2021, co-defendant MAHDE Dannon pled guilty to one count of Attempting to Provide
Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2 and
2339B(a)(1).

MOYAD's Base Offense Level was 26 (U.S.S.G. § 2M5.3(a)).  The probation office added two (2) levels because the offense involved the provision of material support with the intent, knowledge, or reason to believe such material support was to be used to commit or assist in the commission of a violent act (U.S.S.G. § 2M5.3(b)(1)(E)), and added twelve (12) additional levels because the offense conduct was a felony that involved, or was intended to promote, a federal crime of terrorism (U.S.S.G. § 3A1.4(a)).  The Probation Office then subtracted three (3) levels to account for MOYAD's acceptance of responsibility, making MOYAD's Total Offense Level 37.  As the instant offense involved a federal crime of terrorism, MOYAD's Criminal History Category is VI by operation of U.S.S.G. § 3A1.4(b).  After permitting the parties to review and object to the initial PSIR, on August 24, 2023, the Probation Office filed a final PSIR and left the advisory sentencing guideline calculation unchanged.

The guideline range resulting from a Total Offense Level of 37 and a Criminal History Category of VI is 360 months to life imprisonment.  However, as the statutory maximum sentence of incarceration for the offense of conviction is 240 months, 240 months becomes the guideline range. (U.S.S.G. §5G1.1(a)).  According to the PSIR, "[t]he probation officer [did] not identif[y] any factors listed under 18 U.S.C. § 3553(a) which would justify a sentence outside of the advisory sentencing guideline range."  (Docket No. 174 at 17.)

This matter is scheduled for a sentencing hearing on December 13, 2023.  For the reasons set forth below, the government believes the Court should sentence the defendant to a term of imprisonment of 240 months, with a lifetime term of supervised release to follow—the same sentence this Court imposed on his brother and co-defendant, MAHDE Dannon.

## II.    Summary of Offense Conduct and Relevant Conduct

### A.    MAHDE Dannon

In approximately June of 2018, MAHDE Dannon, who was awaiting trial on felony theft charges in Lake County, Indiana, hatched a scheme to illegally obtain and deliver firearms, including stolen firearms, to a convicted felon who was an FBI confidential human source ("CHS").  An exhaustive recitation of the facts of this case is set forth in the sworn affidavit of FBI Special Agent Jon Graf, which accompanied the criminal complaint filed on May 15, 2019.[2] (Docket No. 2.)  In the interests of brevity, the government attaches a copy of the criminal complaint as Exhibit 1 to this memorandum, and incorporates that recitation of facts in the affidavit herein by reference.

In summary, between July 2018 and December 2018, MAHDE Dannon obtained and sold approximately ten firearms and numerous rounds of ammunition to the CHS, whom MAHDE Dannon knew to be a convicted felon and prohibited from possessing firearms and ammunition. That lot of ten firearms included firearms that were stolen.  During that same time-period, because MAHDE Dannon had been charged with felony theft in an information filed in Lake County Superior Court, MAHDE Dannon was himself prohibited from receiving firearms and ammunition that had been transported in interstate commerce.  While these offenses are themselves exceedingly serious, they pale in comparison to the criminal conduct that would follow.

---

[2] The government submits that, if called to testify as a witness at sentencing in this matter, Special Agent Graf's testimony would confirm the facts outlined in the criminal complaint affidavit.

**B.     MOYAD Dannon Gets Involved and the Dannons Manufacture Untraceable Ghost Guns**

In approximately July of 2018, MAHDE Dannon introduced his older brother, MOYAD Dannon, to the CHS and suggested that MAHDE and MOYAD could manufacture untraceable "ghost guns" and sell them to the CHS.  This fact warrants emphasis:  the scheme to illegally manufacture and sell "ghost guns" was one that MAHDE Dannon presented to the CHS shortly after their initial meeting, and not criminal activity the CHS (or indeed the FBI) had contemplated at the inception of this investigation.[3]  In fact, MAHDE Dannon told the CHS that he and his brother MOYAD had already manufactured ghost firearms, including pistols, using tools they had accumulated at their residence.[4]  Part of MAHDE Dannon's "sale's pitch" to the CHS on why the "ghost gun" endeavor was a good opportunity was the facts that un-serialized weapons were very difficult to trace and therefore worth more money and highly sought after by certain gun buyers.

The CHS later introduced MAHDE and MOYAD Dannon to an FBI undercover employee ("UCE").  Between July 2018 and December 2018, MAHDE and MOYAD Dannon began to manufacture untraceable "ghost guns" by purchasing un-serialized firearms parts online and assembling those parts into fully-functioning, .223 caliber, semi-automatic rifles, which they sold to the UCE.  Between July and December of 2018, MAHDE and MOYAD Dannon manufactured and sold approximately eight untraceable, semi-automatic, .223 caliber rifles to the

---

[3] Moreover MAHDE, on his own initiative, began obtaining "street guns" through various methods and sought to sell those to the CHS before the CHS and the FBI were prepared to undertake "controlled buys" from the MAHDE.

[4] When the residence was searched in May of 2019, FBI agents recovered a "jig" used for manufacturing pistols from parts purchased online.  This fact is significant because at no time during the investigation did the FBI seek to purchase "ghost" pistols from the Dannon brothers.  In other words, the Dannon brothers had obtained this material on their own, independently, in furtherance of their illegal firearms manufacturing scheme.

UCE.  Importantly, the UCE negotiated to purchase the weapons from MAHDE and MOYAD Dannon for significantly less money than the brothers were initially looking to charge.

In November 2018, MAHDE Dannon, in MOYAD Dannon's presence, initiated a conversation with the CHS and UCE about the Dannon brothers' desire to manufacture untraceable/non-serialized, fully-automatic, .223 caliber rifles, using much the same process they used to manufacture the semi-automatic rifles.  During that conversation, MAHDE and MOYAD demonstrated significant technical and legal knowledge about manufacturing fully-automatic weapons.  And, once again, the sale/purchase price for the fully-automatic weapons was carefully negotiated by MOYAD Dannon, who demonstrated a keen understanding of the value of untraceable machine-guns.  Here too, however, the price the UCE agreed to pay was significantly less than what MAHDE and MOYAD initially sought.

In December of 2018, MOYAD Dannon and the UCE traveled to Bloomington, Indiana, to meet with another UCE posing as a potential buyer for fully-automatic weapons.  Following that trip, MOYAD expressed concern that the UCE he'd met in Bloomington was a member of a "white militia" and selling fully-automatic weapons to such a person might result in the weapons remaining in the United States and ultimately leading the FBI to MOYAD.  MOYAD underscored his desire for the weapons they manufactured to be shipped outside of the United States.

In February of 2019, the Dannon brothers built one fully-automatic rifle which they provided to the UCE as a means of marketing the Dannons' "ghost gun" building skills to other potential buyers.

C.      **MOYAD Dannon Travels to the Border and Learns of Plans to Ship Fully Automatic Rifles to ISIS**

Shortly thereafter, MOYAD Dannon accompanied the UCE to a location near the U.S. southwest border in an effort to market that rifle, and additional fully-automatic rifles, to a potential buyer ("CHS2"). During that trip, MOYAD Dannon learned that CHS2 sought to ship the fully-automatic weapons to the Middle East, where they would be used by ISIS. Following the trip to the southwest border, both MAHDE and MOYAD Dannon were each aware of the ultimate purported destination of the weapons, and the Dannon brothers agreed to manufacture at least 55 additional fully-automatic "ghost guns" which they understood and believed would be shipped to the Middle East to support ISIS. These 55 fully-automatic "ghost guns" were in addition to the above-referenced fully-automatic rifle that CHS2 purchased from MOYAD during the trip to the southwest border.

In furtherance of that agreement, on May 15, 2019, MAHDE and MOYAD Dannon manufactured five untraceable, fully-automatic, .223 caliber rifles from parts they had purchased online. At that time, the Dannon brothers understood and believed that the five automatic rifles would be sent overseas to ISIS. After building the fully-automatic rifles, the Dannon brothers sold all five weapons to undercover FBI employees posing as employees of CHS2. Almost immediately thereafter, the Dannon brothers were arrested by the FBI. It is important to note that MAHDE and MOYAD Dannon were purchasing the materials needed to manufacture the semi-automatic firearms they sold to undercover FBI employees. Only after the Dannon brothers suggested manufacturing fully-automatic weapons did the FBI assist the manufacturing process by milling lower receivers purchased by MAHDE and MOYAD Dannon and providing auto sears and springs necessary for the functioning of a fully-automatic rifle.

6

### D.    MOYAD Dannon's Desire to Assist ISIS

Significantly, however, contemporaneous with the Dannon brothers' efforts to manufacture fully-automatic weapons for ISIS, between February and May of 2019, MOYAD Dannon had numerous and extensive conversations with CHS2 and an FBI Online Covert Employee ("OCE"), who MOYAD Dannon believed was a member of ISIS then fighting in Syria.  (Docket No. 2, ¶¶ 125-136, 141-145, 147-151, 153-158, 160.)  During those conversations, MOYAD Dannon expressed his desire to travel from Indiana to ISIS-controlled areas of Syria, where he sought to utilize his knowledge of firearms and other skills to provide direct assistance to ISIS in its fight against U.S. and coalition forces as well as against the government of Syria.  In speaking with CHS2 and the OCE, MOYAD Dannon sought their assistance and advice in making arrangements for MOYAD Dannon to travel to Syria via Turkey or another adjoining country.

At one point during his conversations with the OCE, MOYAD Dannon told the OCE that when he (MOYAD) reached Syria he (MOYAD) could help ISIS militarily, either on the front lines or in the security department, and advised the OCE that he (MOYAD) had experience with weapons, mechanics, and electricity, and that he was knowledgeable in planning and implementing.

At another point during his conversations with the OCE, MOYAD Dannon provided the OCE with a detailed narrative related to the inspection, maintenance, assembly, cleaning, and operation of an M-16 rifle.  MOYAD Dannon sent that information in response to a request by the OCE for MOYAD Dannon to provide whatever assistance he could to help OCE and his fictitious ISIS colleagues utilize a cache of M-16 rifles ISIS had purportedly seized from Kurdish fighters.

Emblematic of MOYAD Dannon's belief in the cause of ISIS, in a search incident to his arrest FBI agents located MOYAD's car keys on his person. Attached to the same keychain as MOYAD's car keys, agents discovered a flash drive containing approximately 16 gigabytes of digital data. A search of the contents of the flash drive revealed most of the data on the drive consisted of ISIS propaganda, including horrifically violent videos depicting ISIS fighters beheading civilians and hostages, and ISIS snipers killing U.S. military personnel. Identical ISIS propaganda videos were discovered on a laptop computer seized from MOYAD's room at his parents' residence on the day of his arrest.

## III.    Applicability of § 3A1.4 Terrorism Enhancement

### A.    Background

As noted above, on June 9, 2023, MOYAD Dannon pled guilty pursuant to a plea agreement, to one count of Attempting to Provide Material Support and Resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2 and 2339B(a)(1). In the plea agreement, the parties stipulated to the application of certain U.S. Sentencing Guideline Provisions. Notably, however, in paragraph 27(c) of the plea agreement the parties outlined their disagreement over whether the terrorism enhancement prescribed by U.S.S.G. § 3A1.4 was applicable to the instant case. (Docket No. 154 at 13.) The parties agreed that the Court should determine the applicability of that section at the time of sentencing. (*Id.*)

On July 18 and August 24, 2023, the U.S. U.S. Probation Office filed initial and final PSIRs, respectively. (Docket Nos. 167 and 174.) In both versions of the PSIR, the probation officer determined the twelve (12) level terrorism enhancement prescribed by U.S.S.G. §3A1.4(a) was applicable to this case. Following the release of the initial PSIR MOYAD objected to the application of § 3A1.4 to his case, arguing that MOYAD was solely motivated to

commit the offense by money, and he was willing to sell the firearms to recipients besides ISIS, including Mexican drug dealers.  (Docket No. 174 at 20.)  According to MOYAD, his acquiescence and lack of objection to the planned transfer of the firearms to ISIS "is not evidence that he possessed the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  *Id*.  For the reasons that follow, those arguments are not only belied by the overwhelming evidence in this case, they are also legally without merit.

**B.      The Law**

Section 3A1.4 of the Sentencing Guidelines calls for a twelve (12) level increase in the defendant's base offense level if the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism."  U.S.S.G. § 3A1.4.  The term "involve" as used in § 3A1.4 means "to include."  *United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008) (citing *United States v. Arnaout,* 431 F.3d 994, 1001 (7th Cir.2005)).  More specifically, an offense "involves" a federal crime of terrorism only if the crime of conviction is itself a federal crime of terrorism as defined in 18 U.S.C. §2332b(g)(5).  *Parr*, 545 F.3d at 504.

"Federal crime of terrorism" is a term of art defined in Title 18, United States Code, § 2332b(g)(5) as: an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of one of the offenses enumerated in § 2332b(g)(5)(b).  18 U.S.C § 2332b(g)(5).  The definition of federal crime of terrorism is stated in the conjunctive, so both requirements must be met.  *Parr*, 545 F.3d at 504.  Since MOYAD's crime of conviction (violation of 18 U.S.C. § 2339B(a)(1)) is specifically listed in § 2332b(g)(5)(B), the only question is whether a MOYAD's violation of 18 U.S.C. §  2339B satisfies the first prong of the definition.  *Id*.

The U.S. Court of Appeals for the Seventh Circuit has held that the terrorism enhancement in § 3A1.4 applies if the district court finds that the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by § 2332b(g)(5)(B). *United States v. Ashqar*, 582 F.3d 819, 825 (7th Cir. 2009) (quoting *United States v. Arnaout,* 431 F.3d 994, 1001 (7th Cir.2005)).

In enhancing a defendant's sentence pursuant to §3A1.4, it is important for a sentencing court to: (1) articulate which enumerated federal crime of terrorism the defendant's conduct involved or intended to promote; (2) satisfy the elements of § 2332b(g)(5)(A); and (3)support its conclusions by a preponderance of the evidence with facts from the record. *Arnaout* at 1002; *see also United States v. Hassan*, 26 F.4th 610, 625 (4th Cir. 2022) ("Prior to applying the § 3A1.4 enhancement, a sentencing court must conclude that the government's evidence has satisfied the "federal crime of terrorism" definition by a preponderance of the evidence. A court deciding whether to impose the terrorism enhancement must resolve any factual disputes that it deems relevant to application of the enhancement, and then, if it finds the requisite intent, should identify the evidence in the record that supports its determination.)

Based on MOYAD's plea of guilty to a violation of 18 U.S.C. § 2339B, which is an offense enumerated in § 2332b(g)(5)(b), as well as his written objection to the PSIR, it appears that MOYAD's objection to the imposition of the enhancement in § 3A1.4 is focused on the first, "calculated to influence, affect, or retaliate," prong of the "federal crime of terrorism" definition. Specifically, MOYAD would have the Court conclude that, because his purported sole motivation for manufacturing and selling fully-automatic firearms to ISIS was money, his conduct cannot be construed as calculated to influence, affect, or retaliate against government. That argument is both legally and factually flawed.

As an initial matter, the U.S. Probation Office provided a thorough and thoughtful response to MOYAD's objection concerning the application of § 3A1.4 to his case. (Docket No. 174 at 20-21.) The government incorporates the totality of that argument herein by reference.

To put a finer point on the Probation Office's response, and assuming for the sake of argument that money was MOYAD's sole motivation in selling firearms to ISIS, MOYAD's argument attempts to conflate his individual motivations for violating 18 U.S.C. § 2339B with the calculated, obvious, and intentional *effect* of supplying machineguns to ISIS; namely that ISIS will use those machineguns to commit additional acts of terrorism against governments, including the United States.[5]  This argument has been universally rejected my numerous courts of appeals.[6]

For example, in *United States v. Rahim*, 860 Fed. Appx. 47, 57-58 (5th Cir. 2021), the Fifth Circuit held that even if §2332b(g)(5) incorporates a "specific intent" requirement into the definition of "federal crime of terrorism," proving such intent does not require proof of a defendant's particular motive[7]. *Id*. (citing *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)).  Instead, the word "calculated" in the definition is concerned with the object that the

---

[5] For example, a defendant who provided material assistance to terrorist organizations, but claimed that her goal was to assist an oppressed group of Muslims, is eligible for the enhancement regardless of her purportedly benign motive, because distinction can be drawn between what motivates a person to do an act and what that act is calculated to achieve.  *United States v. Giampietro*, 614 F.Supp.3d 616, 621 (M.D. Tennessee 2022)(citing *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010))

[6] Even those circuits requiring the government to prove a defendant "specifically intended" to influence or affect the conduct of government do not require influencing/affecting government to be the defendant's sole purpose in committing the offense.  So long as the defendant intended to influence to conduct of government, §3A1.4 will apply even if the defendant also harbored other motivations, such as an intent to gain financial reward or impress a sweetheart.  *United States v. Wright*, 747 F.3d 399, 418 (6th Cir. 2014)(concurring opinion).

[7] In *Rahim*, the Fifth Circuit did not definitively decide whether § 2332b(g)(5)(A) incorporates a "specific intent requirement", as some circuits have concluded, but instead the court assumed such a requirement for purposes of its analysis.

actor seeks to achieve through planning or contrivance, so the appropriate focus is not on the defendant, but on his offense, asking whether it was calculated, i.e., planned—whatever the motive—to achieve the stated object. *Id*. Put another way, if evidence establishes that a defendant engaged in criminal conduct with knowledge that his confederates solicited his actions to effectuate politically motivated bombings, or homicidal attacks on a country's security forces or its political leaders, such proof could demonstrate that the defendant's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object.[8] *Awan*, 607 F.3d at 317. "***A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics***." *Id*. (emphasis added). Simply put, a defendant's personal *motive* is not relevant in this context, when his *intent* was to supply arms to a terrorist organization that targeted the United States. *Arcila-Ramirez* at 854 (citing *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011)).

### C.    Argument

In the instant case, the Dannon brothers conspired to supply ISIS with fully-automatic rifles and attempted to achieve that aim by assembling firearms from parts they had acquired online and selling those firearms to individuals they believed were acting on behalf of ISIS. Indeed, MOYAD Dannon has stipulated that he believed the fully-automatic weapons he was selling to the FBI were going to ISIS, a barbaric terrorist organization engaged in horrific acts of violence against both government and civilian targets in the Middle East. (Docket No. 155 at 3, ¶ 1(d).) At the same time, MOYAD Dannon has stipulated his belief that the people buying his

---

[8] And, because a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts. *Id*.

firearms wanted practical weapons that were going to be ***used in a war zone***.  (Docket No. 155 at 3, ¶ 1(d).)(emphasis added)  It is beyond dispute that ISIS is an enemy of the United States.  *See United States v. Khan*, 938 F.3d 713, 719 (5th Cir. 2019).  Accordingly, contrary to counsels objection to the PSIR, the record before the Court ***does*** contain sufficient evidence that MOYAD's conduct was calculated to influence or affect the conduct of the United States because ISIS's terrorist acts are intended to intimidate or coerce governments, including the United States and other governments in the Middle East.  *Id*.  And, during time period that MAHDE and MOYAD Dannon were building fully automatic rifles for ISIS, ISIS was actively engaged in military and terrorist operations against a number of governments in Syria and elsewhere.

But that is not the only evidence supporting a finding that MOYAD's actions were calculated to affect government.  The FBI gathered overwhelming evidence that MOYAD Dannon was personally motivated to support ISIS and the terrorist acts they were committing, especially in Syria.  By way of example, when MOYAD met with CHS2 in the Arizona desert on February 13, 2019, MOYAD communicated his understanding that the weapons CHS2 was purchasing were going to a war zone, (Docket No. 2 at 39, ¶ 121(g)), discussed with CHS2 the difference between an M-16 and an AK-47, and expressed to CHS2 that the M-16 (the same caliber and general design as the firearms the Dannon brothers were building) was the more accurate weapon.  (Docket No. 2 at 39, ¶ 121(i).)  During his conversations with CHS2 in Arizona, MOYAD also displayed a detailed knowledge of ISIS operations in Syria, including that the United States military was helping Kurdish forces control parts of that country, and MOYAD told CHS2 that "god willing" he (MOYAD) would travel there in the future.  (Docket No. 2 at ¶ 123.)

Two days after his return to Indiana from Arizona in February 2019, MOYAD made contact with an FBI Online Covert Employee ("OCE") whose contact information was given to MOYAD by CHS2 and who MOYAD believed was a member of ISIS fighting in Syria.  Over the course of the following three months, MOYAD exchanged a significant number of messages with the OCE. [9]  During those exchanges with the OCE, MOYAD expressed his desire to travel from Indiana to ISIS-controlled areas of Syria, where he sought to utilize his skills to provide direct assistance to ISIS in its fight against U.S. and coalition forces as well as against the government of Syria.  (Docket No. 2, ¶¶ 125-136, 141-145, 147-151, 153-158, 160.)  In speaking with CHS2 and the OCE, MOYAD also sought assistance and advice in arranging for MOYAD to travel to Syria via Turkey or another adjoining country.

During one of his first exchanges with the OCE, MOYAD asked the OCE when he (OCE) had given his Bayah (pledged his allegiance) to the Islamic State.  Docket No. 2 at ¶127. When the OCE responded to MOYAD about his purported Bayah, the OCE asked if MOYAD had given his Bayah and MOYAD responded that he had not, because the Bayah is given "in that land", or words to that effect.  Docket No. 2 at ¶128.  Nevertheless, MOYAD expressed to the OCE that he (MOYAD) was on the right path with the Islamic State's followers and that he would be until judgment day.  (*Id.*)  MOYAD also told the OCE that he (MOYAD) was the OCE's brother and on the same path.  (*Id.*)

During another exchange with the OCE, MOYAD told the OCE that when he (MOYAD) reached Syria he (MOYAD) could help ISIS militarily, either on the front lines or in the security department, and advised the OCE that he (MOYAD) had experience with weapons, mechanics,

---

[9] A detailed account of these online and in-person exchanges can be found in the Criminal Complaint, Docket No. 2, in paragraphs 125-136, 141-145, 147-151, 153-158, and 160.

and electricity, and that he was knowledgeable in planning and implementing.  (Docket No. 2, ¶¶ 129, 136.)  At another point during his conversations with the OCE, MOYAD provided the OCE with a detailed narrative related to the inspection, maintenance, assembly, cleaning, and operation of M-16 rifles.  (Docket No.  2, ¶¶ 143-144, 147-148.)  MOYAD sent that information to the OCE in response to a request by the OCE for MOYAD to provide whatever assistance he could to help the OCE and his fictitious ISIS colleagues utilize a cache of M-16 rifles that ISIS had purportedly seized from Kurdish fighters.  (*Id*.)

Finally, and perhaps most tellingly, at the time of his arrest in May of 2019, the FBI located a keychain on MOYAD's person that held the keys for MOYAD's vehicle.  Attached to that same keychain, the FBI located a thumb-drive electronic media storage device, which was examined by FBI computer experts.  The results of that examination were reviewed in detail by FBI Special Agent Jon Graf.  Special Agent Graf observed that the thumb-drive contained approximately 16 gigabytes of data, the majority of which consisted of ISIS propaganda videos, including videos of U.S. servicemembers being shot by snipers in Iraq and numerous videos of ISIS fighters beheading or otherwise killing hostages and attacking unarmed civilians.  Once again, these videos were on a thumb drive attached to MOYAD Dannon's keychain.

While the evidence in the PSIR and the stipulated factual basis are sufficient to carry the government's burden with respect to the application of § 3A1.4 of the Sentencing Guidelines to MOYAD's case, the government's argument is buttressed by the broader evidence, outlined above, gathered during the investigation of the Dannon brothers.  Such evidence is both relevant and permissible for the court to consider in determining the applicability of the § 3A1.4 enhancement.  *Rahim,* 860 Fed. Appx. 47 (5th Cir. 2021) (citing U.S.S.G. §1B1.3(a)(1)) (sentencing enhancements are determined on the basis of all acts and omissions committed,

aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, and relevant conduct considered for such enhancements is not limited to the statutory elements the Government must prove at trial.) Indeed, the overwhelming evidence in this case establishes beyond doubt that while MOYDAD Dannon may have been motivated by money, he was also motivated by a deep-seeded personal desire to support and advance the cause of ISIS. Among the many examples of MOYAD's actual intent to support ISIS by building automatic weapons can be found in the fact that he was contemporaneously providing detailed instructions for maintaining M-16 rifles to, and sought advice and assistance in traveling to Syria to join ISIS from a person whom MOYAD believed was actually in Syria fighting for ISIS. *See, e.g.*, *United States v. Giampietro*, 614 F.Supp.3d 612, 617 (M.D. Tennessee 2022)("The Court need go no further than Defendant's Plea Agreement to find that the terrorism enhancement applies. During the Information's timeframe, Defendant knowingly and intentionally rendered advice and offered assistance to an undercover agent ("UCE-1") whose husband ("UCE-2") had purportedly sworn an oath of allegiance to Hay'at Tahrir al- Sham (or "HTS") and who intended to travel to Syria to join HTS and fight on its behalf. This, coupled with the surrounding circumstances, is more than enough."). That same evidence belies any innocent explanation or benign motivation, and makes clear that MOYAD Dannon's actions in this case were purposefully calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Accordingly, MOYAD Dannon's conviction was a felony that involved, or was intended to promote, a federal crime of terrorism, and the twelve (12) level enhancement prescribed by § 3A1.4 applies to his case.

III.     **Anticipating Defendant's Sentencing Arguments**

A.     **Minimizing Motives and Seeking Refuge in Other Guideline Provisions**

In many ways the argument advanced by MOYAD Dannon is similar to that advanced at sentencing by co-defendant MAHDE Dannon.  MAHDE claimed that  he was motivated by "avarice" and  equated his to a "run-of-the-mill" firearms trafficking offense (if such a thing exists).  The problem with this argument is two-fold.  First, if greed and a desire to make money were truly MOYAD's sole motivations (which they were not), those motives cannot possibly mitigate the seriousness of knowingly attempting to sell fully automatic weapons to a barbaric terrorist organization.

Second, arguing that the Court should look to another section of the guidelines for guidance on fashioning a reasonable sentence necessarily invites the Court to omit from its consideration critical aspects of the instant case that other sections of the guidelines do not consider; namely that the defendants in this case sought to sell untraceable firearms for delivery to a foreign terrorist organization that would use them to commit heinous crimes against humanity.  The U.S. Sentencing Guidelines are not a smorgasbord to be picked over by defendants looking to minimize the true nature of their criminal conduct.  The principal purposes of the Guidelines are to reflect the seriousness of the crime of conviction, to punish and deter, and to avoid unnecessary sentencing disparities.  It is therefore vitally important to correctly calculate and apply the sentencing guideline that corresponds to the offense of conviction.  In the government's view, the nexus to terrorism is the gravamen of the crime of conviction in this case and should factor heavily into fashioning the correct sentence.  The guideline calculation used by the Probation Office in this case is the correct one, and the only one the Court should consider.

With regard to avoiding unnecessary sentencing disparities, co-defendant MAHDE Dannon was sentenced to 240 months and a lifetime of supervised release for his role in this case. While it was MAHDE Dannon who initially approached CHS1 about the ghost gun building scheme, it was MOYAD Dannon who painstakingly negotiated the terms of the sales to CHS2 and the UCEs. It was MOYAD Dannon who initially learned the weapons were destined for ISIS and agreed to build them anyway. It was also MOYAD Dannon who physically assembled the rifles, both semi-automatic and automatic, that were sold to the UCEs. And, importantly, it was MOYAD Dannon who was contemporaneously communicating with two individuals (OCE and CHS2) about traveling to Syria to physically join ISIS while simultaneously providing technical support to OCE, whom MOYAD believed was an ISIS fighter, on the maintenance of M-16 rifles purportedly seized from Kurdish forces in Syria. Under the circumstances, while MOYAD and MAHDE Dannon had different roles in this criminal scheme, each of their roles was exceeding serious and deserving of the maximum statutory penalty prescribed by the statute of conviction.

The government also anticipates that MOYAD will argue that, if the Court adopts the guideline calculation in the PSIR and determines that § 3A1.4's twelve (12) level terrorism enhancement applies, the Court should nevertheless consider a significant variance from the resulting 240-month advisory guideline range. In the face of such an argument, however, it is important to consider that by allowing MOYAD to plead guilty to only the 18 U.S.C. § 2339B charge, the government has already "capped" MOYAD's exposure to the Chapter 3 enhancement at 240 months, and afforded him a significant "discount" of 120 months below what his advisory guideline range otherwise would be.

### B.     MOYAD's "Difficult" Upbringing Does Not Reduce His Culpability

MOYAD may also cite challenges during his childhood and may reference studies of cognitive development in adolescents and young adults to excuse his calculated, repeated, and extraordinarily dangerous criminal conduct.

At the time of the criminal conduct in this case, MOYAD Dannon was between the ages of 21 and 22 years old.  Nowhere in the PSIR is it suggested that MOYAD Dannon suffers from any physical or mental condition that abnormally impedes/impairs his thought processes or brain development, or that his cognitive development is slower than the average adult male his age. And while studies may show that the human brain continues to develop from early childhood through adulthood, nothing in the PSIR suggests that the normal brain development process is the cause of MOYAD Dannon's methodical quest to sell untraceable firearms to violent groups, be they drug traffickers in Mexico or ISIS terrorists in the Middle East.

Everything in the PSIR points to the fact that MOYAD Dannon had a stable upbringing, was surrounded and supported by family members, and all of his needs were met.  It is equally apparent that MOYAD Dannon is an intelligent young man, who benefited from a public-school education in Chicago and subsequently Fishers, Indiana.  After graduating from Fishers High School and he went on to graduate (with honors) from the Aviation Institute of Maintenance in Indianapolis, Indiana.

## IV.     Fashioning an Appropriate Sentence under 18 U.S.C. § 3553(a)

In light of the facts of this case, the factors set forth in § 3553(a) weigh heavily in favor of a lengthy term of imprisonment for MOYAD Dannon.

There can be no sugarcoating the nature and circumstances of the crime that occurred in this case.  MOYAD sought to, agreed to, and repeatedly attempted to manufacture fully-

automatic weapons for sale to ISIS, a horrifically violent and brutal terrorist organization. In agreeing to supply ISIS with high-power weaponry, MOYAD necessarily embraced the orthodoxy of ISIS; the use of indiscriminate killing, violence, and terror to achieve the organization's goals. *See, e.g.*, Graham Wood, THE ATLANTIC, *What ISIS Really Wants* (available at https://www.theatlantic.com/magazine/archive/2015/03/what-isis-really-wants/384980/) (illuminating ISIS's views and explaining that "the lack of objective reporting from its territory makes the true extent of the slaughter unknowable, but social-media posts from the region suggest that individual executions happen more or less continually, and mass executions every few weeks"); *see also United States v. Lutchman*, 910 F.3d 33, 36-37 (2d Cir. 2018) ("Lutchman pledged his allegiance to ISIL and stated his intention to 'spill the blood' of nonbelievers."); *United States v. Van Haften*, 881 F.3d 543, 543 (7th Cir. 2018) ("Van Haften fits the typical profile of a terrorist: he believes that ISIS is fighting a holy war against America—a war that will culminate in the establishment of a global caliphate."); *United States v. Farah*, 899 F.3d 608, 612 (8th Cir. 2018) ("Daud and Farah longed for an opportunity to participate in an ISIL operation on American soil, and Omar looked forward to the demise of the United States: '[The infidels] are getting it. Allah will not let America be a superpower for this long . . . . [T]heir time is coming.'").

MOYAD cannot claim that he was ignorant to the hellish levels of violence perpetrated by ISIS in the Middle East and North Africa. Indeed, MOYAD demonstrated a keen awareness of ISIS operations in Syria during his conversations with CHS2 and the OCE, and he carried a flash drive on his key ring which contained nearly 16 gigabytes ISIS propaganda and videos depicting ISIS inspired terrorists committing unspeakable acts of violence, including numerous beheadings and the burning alive of a caged Jordanian air force pilot. And there is no shortage

of media reported examples of bombings, beheadings, mass shootings, and vehicle attacks perpetrated in the name of ISIS, not only in places like Iraq and Syria, but also in major international cities including Paris, Nice, London, Berlin, Orlando, and San Bernardino.  ISIS is a group that is at war with the west including with the United States.  Despite intimate knowledge of bloodthirsty methods ISIS employed to further its goals, MOYAD Dannon sought to assist this group further, by supplying them with deadly weaponry.  That is what MOYAD Dannon stands convicted of, and these are not "merely" firearms offenses.

While it is abundantly clear from evidence gathered during this investigation, including the contents of his electronic devices, that MOYAD Dannon was drawn to the barbarity of ISIS and sought to contribute to it by supplying them with untraceable automatic weapons.  That kind of allegiance to ISIS, and committed willingness of foreign nationals like MOYAD and MAHDE Dannon to support their jihad, are essential to ISIS advancing its goals. *See* Wood, *What ISIS Really Wants*.

The point does not need to be belabored: ISIS has killed countless people, and seeks, without exaggeration, the destruction of the United States of America. *See, e.g.*, *United States v. Suarez*, 893 F.3d 1330, 1332 (11th Cir. 2018) ("When the FBI arrested Harlem Suarez, he had already declared allegiance to the Islamic State of Iraq and al- Sham (ISIS), attempted to recruit others to join him in destroying the United States"), *cert. denied*, No. 18-6808, 2019 WL 113456 (U.S. Jan. 7, 2019); *Doe v. Mattis*, 889 F.3d 745, 749 (D.C. Cir. 2018) (ISIS "controls territory in Iraq and Syria, and has perpetrated and aided terrorism there and around the world, killing several thousand civilians, including American aid workers and journalists."); *United States v. Khusanov*, 731 Fed. Appx. 19 (2nd Cir. 2018) (noting that ISIS has a "history of particularly

21

violent conduct" and "target[s] members of the United States armed forces serving abroad and encourage[s] terrorist acts within this country") (citation omitted).

And there can be no doubt that MOYAD Dannon truly meant to support ISIS. He was well-aware of the destination of the weapons he was building, and MOYAD and MAHDE went to great lengths to procure parts necessary to manufacture the firearms in question, and to ensure those firearms would be difficult—if not impossible—to trace back to he and his brother MAHDE. That was a very real effort. And importantly, MOYAD Dannon desired to provide even greater support to ISIS, by traveling to Syria and joining the terrorist organization.

While law enforcement intercepted MAHDE and MOYAD Dannons' firearms before they could actually reach ISIS and kill anyone, that fact does not mitigate the dangerous plot that MAHDE and MOYAD had concocted and set in motion. The nature and circumstances of offenses in this case are shocking. MOYAD Dannon's actions were inherently dangerous and implicate the Material Support statute's *raison d'etre*. Section 2339B "criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm." *United States v. Farhane*, 634 F.3d 127, 148 (2d Cir. 2011). As the Supreme Court has stated, "[t]he material-support statute is, on its face, a preventive measure - - it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). In *Boim v. Holy Land Found, for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc), the Seventh Circuit held that giving money to Hamas, in violation of Section 2339B, necessarily involves an act "dangerous to human life." As *Boim* reasoned, providing financial support to Hamas, "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people[.]" *Id*. at 694. *Boim*'s reasoning is exponentially more persuasive

in this case, where the support the defendants sought to provide were fully-automatic, military grade firearms.

The counter argument that the history and characteristics of the defendant somehow weigh in favor of a variance from the advisory guideline range are simply not persuasive. At the time of his arrest in the instant case, MOYAD Dannon was living in Fishers, Indiana, with his parents and siblings. The PSIR paints a picture of MOYAD Dannon coming from a stable, two-parent, home where both parents participated in his nurturing and upbringing and where both parents placed reasonable expectations on MOYAD in the hope that he would become a respectable and contributing member of society. Unfortunately, MOYAD Dannon chose a different path.

It is beyond argument that MOYAD Dannon's actions directly implicate the concerns driving the prohibition on providing material support to a foreign terrorist organization and, those actions merit a harsh sanction.

## IV.     **Conclusion**

For the foregoing reasons, the United States submits that the only sentence that will accomplish the statutory goals of sentencing in this case is a sentence of 240 months of imprisonment, followed by a lifetime term of supervised release. Such a sentence will take into consideration the need for the sentence to reflect the grave nature of the offense, provide general and specific deterrence, and protect the public from future crimes of the defendant.

Accordingly, the government asks the Court to impose a sentence of 240 months of imprisonment, followed by a lifetime term of supervised release.

Respectfully Submitted,

ZACHARY A. MYERS
United States Attorney

By:    s/*Matthew J. Rinka*
       Matthew J. Rinka
       Assistant United States Attorney
       Chief, National Security Unit

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2023, a copy of the foregoing Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

By:    s/*Matthew J. Rinka*
       Matthew J. Rinka
       Assistant United States Attorney