**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:19-cr-00229-RLY-KMB-02** |
| | ) | |
| **MOYAD DANNON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT MOYAD DANNON'S AMENDED SENTENCING MEMORANDUM**

Comes now the defendant, Moyad Dannon ("Moyad"), by counsel, and respectfully submits the following Memorandum in preparation for his sentencing hearing.

## I.    INTRODUCTION.

Moyad Mohdkear Dannon [1], now twenty-six years old, is scheduled for sentencing on December 13, 2023 following his entry of a plea of Guilty to Count 8 of the  Indictment which alleges that he committed the offense of Attempting to Provide Material Support or Resources, namely firearms, to a Designated Foreign Terrorist Organization, namely the Islamic State of Iraq and the Levant, in violation of Title 18, U.S.C. §§ 2 and 2339B(a)(1). Moyad's plea was entered pursuant to the terms of a Petition and Plea Agreement filed by the parties herein on May 30, 2023, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). [Dkt. 154]

Count 8 carries a statutory penalty of 0- 20 years imprisonment, a fine not exceeding $250, 000.00 and a term of supervised release of up to Life. The parties' Agreement leaves the determination of the sentence, of any fine, and of the term of supervised release to the discretion of the Court. Further, the parties' Agreement memorializes their disagreement with the

---

1 The defendant will be referred to as "Moyad" herein to avoid confusion with his father "Mr. Dannon" and his co-defendant brother, "Mahde".

computation of the advisory guideline range. See, Section II, *infra*.

Moyad argues that the so-called "terrorism enhancement", U.S.S.G. 3A1.4(a), is not mandatory and should not be applied in his case; and that the §3553a factors, including the nature and circumstances of the offense and his personal history and character, justify a downward variance. Further, that a downward variance will not result in an unreasonable disparity, either with his co-defendant or with other, similarly situated defendants, locally and nationally.

As of the date of sentencing, Moyad will have served a total of fifty-five months in pre-trial detention.

## II.    THE "TERRORISM ENHANCEMENT" DOES NOT APPLY IN THIS CASE.

The so-called "terrorism enhancement", U.S.S.G. § 3A1.4, provides as follows:

(a) If the offense is a felony that involved or was intended to promote a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4. Application Note 1 provides that the term "federal crime of terrorism" is defined by "the meaning given that term in 18 U.S.C. § 2332b(g)(5)". That statute, in turn, defines a "[f]ederal crime of terrorism" as an offense that is (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; **and** (2) listed in 18 U.S.C. § 2332b(g)(5)(B)(i)." 18 U.S.C. § 2332b(g)(5)(A) & (B). The definition is stated in the conjunctive, so both requirements must be met. *United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008).

First, a federal crime of terrorism is an "offense that ... is calculated to influence or affect the conduct of government by intimidation or coercion [the "motivational element"], or to

2

retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Second, the offense must be

a violation of a specific federal criminal statute listed in 18 U.S.C. § 2332b(g)(5)(B). The list

includes, *inter alia*, violations of "[18 U.S.C. § ]2339B (relating to providing material support to

terrorists)." Thus, a 'federal crime of terrorism' under § 2332b requires *both* the commission of

one of the enumerated crimes – here, a violation of §2339B - *and* a finding that the required

"motivational element" set forth in § 2332b(g)(5)(A) has been met. *United States v. Wright*, 747

F.3d 399, 409 (6th Cir. 2014).

Moyad has been convicted of a violation of §2339B. Therefore, he meets the requirement

that his offense violates a specific federal criminal statute listed in 18 U.S.C. §2332b(g)(5)(B).

However, in order for the enhancement to apply, the "motivational element" of §2332b(g)(5)(A)

must also be met. Moyad contends that the §3A1.4 enhancement does not apply herein because,

even though he is convicted of violating an enumerated offense, his offense was not "calculated

to influence or affect the conduct of government by intimidation or coercion, or to retaliate

against government conduct".

Moyad's is a material support offense, but the terrorism enhancement provision of

§ 3A1.4(a)-(b) does not automatically apply to all material support offenses. It is possible to be

guilty of providing material support to a foreign terrorist organization but not qualify for the

terrorism enhancement if the material support at issue was not intended to influence or affect a

government's conduct by intimidation or coercion. This is because the "calculated" prong of

§ 2332b(g)(5) imposes a specific intent requirement.

A defendant who admittedly provides material support to a terrorist organization is only

subject to the terrorism enhancement if he also acted with the specific intent to influence or

affect government conduct or to retaliate against government conduct and if he planned his

actions with that objective in mind.

In a 2018 material support case, the Seventh Circuit held that "The terrorism enhancement applies so long as the defendant's conduct was '*calculated* ... to retaliate against government conduct,' even if it was also calculated to accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (*emphasis added*). In its Opinion, the Seventh Circuit cited *United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) [2] wherein the Court adopted language from the Fifth Circuit holding that "All that section 3A1.4 requires for an upward adjustment to apply is that one of the enumerated offenses was *calculated* to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Harris*, 434 F.3d 767, 773 (5th Cir.2005). (*emphasis added*).

A majority of the other Circuits have similar holdings requiring a finding of "calculated" intent to influence or affect the conduct of government, including *United States v. Kobito*, 994 F.3d 696,703 (4th Cir. 2021) [3] (D intended to promote the destruction of federal property when he named the Terry Sanford Federal Building as a target); *United States v. Hassan*, 742 F.3d 104, 148–49 (4th Cir.2014) (requiring the district court to find "the specific intent necessary for the terrorism enhancement"); *United States v. Fidse*, 862 F.3d 516, 521 (5th Cir. 2017) (a "[f]ederal crime of terrorism means an offense that'" not only is a violation of one of the enumerated statutory provisions listed in § 2332b(g)(5)(B), but also 'is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government

---

2 In this Earth Liberation Front case involving large-scale destruction at a US Forest Service site, the application of the terrorism enhancement raised two defendants' guidelines to 151-188 months. The sentencing court varied from the range and imposed sentences of 24 months on Christianson and 36 months on her less remorseful co-defendant.
3 Anti-Muslim domestic terrorist sentenced to 60 months in prison, a downward variance from enhanced USSG range of 188-235 months and capped at statutory maximum of 120 months.

conduct.'..."); *United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015) [4]  ("Application of the enhancement requires proof of the defendant's specific intent, i.e., proof that he "acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." (interior citations omitted); *United States v. Ali and Hassan*, 799 F.3d 1008, 1031 (8th Cir. 2015) [5] (the required "calculation" …" is concerned with the object that the actor seeks to achieve through planning or contrivance."); *United States v. Mohamed,* 757 F.3d 757, 759 (8th Cir. 2014) ("Other circuits interpret [the phrase 'calculated to influence or affect the conduct of government'] as imposing a specific intent requirement" and citing additional authority with approval); *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020)  ("The terrorism enhancement, U.S.S.G. § 3A1.4, imposes a significantly harsher punishment on those who commit certain types of crimes of terrorism… It is possible for a defendant to provide material support to a terrorist group in violation of 18 U.S.C. § 2339B(a)(1) without intending that the support or resources would influence, affect, or retaliate against government conduct to satisfy the first prong of the definition of federal crime of terrorism. (citations omitted). The enhancement, therefore, does not automatically apply to all material support offenses."); *United States v. Ansberry*, 976 F.3d 1108, 1128 (10th Cir. 2020) (focusing on the retaliation prong: "In our view, the ordinary meaning of the language used by this statute demonstrates that it requires the offense to be calculated, i.e. , committed with the specific intent, to retaliate against government conduct, objectively defined."); and, finally, *United States v. Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) ("We agree with *Awan* and our other sister circuits that "calculated"

---

4 Domestic terrorism plot to bomb a Cleveland bridge and target other institutions. Court imposed the 3B1.4 enhancement and then varied downward in cases of each of 4 defendants. Stafford's enhanced guidelines were 324 to 405 months and he received a variance to 120 months. *Stafford* at 792.
5 120 month sentence which was 20 years below the USSG and 10 years below the statutory maximum imposed on D who provided material support to al Shabaab and went to trial. 1017.

imposes an intent requirement." [citations omitted])

As the majority of circuits have held, it is possible to be guilty of providing or attempting to provide material support to a foreign terrorist organization without qualifying for the terrorism enhancement. In fact, the enhancement is only available if the government proves, by a preponderance of the evidence, that the material support was *intended* to influence or affect a government's conduct by intimidation or coercion.

Moyad Dannon did not have the specific intent "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" which is required under the "calculated" prong of §2332b(g)(5). Moyad was motivated to assemble firearms for government agents by the government's promise of lucrative payment. He never suggested that the firearms be assembled for the purpose of selling them to ISIS. In fact, he was willing to sell the firearms to various recipients, including Mexican drug dealers, and, only later, acquiesced in the government's purported plan to transfer them through Mexico to ISIS. The fact that the government made him aware of the purported destination of the firearms – to a terrorist organization - and the fact that he was then willing to participate in assembling the firearms with the belief that they would then be sold to ISIS – provides the basis for his conviction of attempting to provide material support to the terrorist organization, but does not constitute evidence that he possessed the specific intent "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct".

Moyad has pled guilty to a violation of Title 18 U.S.C. §§ 2 and 2339(B)(a)(1) (Attempting to Provide Material Support or Resources, namely, firearms, to a Designated Foreign Terrorist Organization, namely, the Islamic State of Iraq and the Levant. The Islamic State of Iraq and the Levant is not a country, nor is it a governing body of any country. It is a

6

terrorist organization [6] which has a presence in multiple countries including Iraq, Syria, Afghanistan, Pakistan, Algeria, the Caucasus, Egypt, Libya, Saudi Arabia, West Africa, and Yemen. [7] In the Sealed Factual Basis to which Moyad agreed, the government agent advised that the firearms in question were to be sent to Syria, Iraq and Libya where they were to support ISIS. [Dkt. 155, ¶ ¶ d, e] There was no discussion about which country or countries, if any, were to be targeted by intimidation or coercion or which country or countries, if any, were to be the target of retaliation.

While Moyad has accepted responsibility for attempting to provide material support to a designated terrorist organization, he contends that he lacked the intent to "influence or affect the conduct of [any] government by intimidation or coercion, or to retaliate against [any specific] government conduct" as required by § 3A1.4, App. Note 1, § 2332b(g)(5). [8]

Without the specific intent to "influence or affect the conduct of [any] government by intimidation or coercion, or to retaliate against [any specific] government conduct", Moyad fails to meet the first requirement of §3A1.4 and the enhancement does not apply.

## III.   EVEN IF APPLICABLE, THE TERRORISM ENHANCEMENT IS NOT MANDATORY.

The United States Sentencing Guidelines are advisory.  While district courts are required to give "respectful consideration" to the guidelines, they are empowered, absent binding plea agreements or statutory restrictions, to impose sentences above or below the advisory ranges.

---

6 Also known by the acronyms ISIS and ISIL.
7 https://www.dni.gov/nctc/groups/isil.html#:~:text=The%20Islamic%20State%20of%20Iraq,entrench%20itself%20in%20both%20countries
8 18 USC 2332b(g)(5) provides that: "(5) the term "Federal crime of terrorism" means an offense that—
(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
(B) is a violation of—
….2339B (relating to providing material support to terrorist organizations)…".

*United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621. While a district court is procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to the sentence, the court "may not presume that the Guidelines range is reasonable" but rather "must. make an individualized assessment" of the case based on the facts presented. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Sentencing judges "exercise a wide discretion" in the type of evidence they may consider when imposing sentence and, consistent with the factors set forth in 18 U.S.C. §3553a, the punishment imposed "should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-488 (2011) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender".) [9]

District courts routinely impose sentences both above and below the advisory range by recognizing U.S.S.G. sanctioned departures and/or finding variances applicable for a wide variety of reasons, including policy disagreements with the structure of the guidelines. *Kimbrough v. United States*, 552 U.S. 85 (2007). In *Kimbrough*, the Supreme Court approved a radical departure from the advisory range based upon the "disproportionate and unjust effect that crack cocaine guidelines have in sentencing." 552 U.S. at 93.

The "terrorism enhancement", U.S.S.G. §3A1.4, invites a similar policy disagreement. The enhancement, enacted in 1995, treats all offenders the same regardless of their criminal history, background or actual conduct. In every case where it is applied, it increases the base offense level by 12 levels and catapults the criminal history to Level VI. For all terrorism offenders who fall within §2M5.3, the advisory range becomes 360 to Life, exceeding the

9 *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S. Ct. 59, 82 L. Ed. 43 (1937)

statutory maximum by a decade. This "draconian" enhancement has been described as a "wrecking ball" to the federal sentencing guidelines which otherwise are designed to take into account the facts of the offense and the individual characteristics of the offender. *United States v. Jumaev*, No. 12-cr-0033, 2018 WL 3490886 *5 (D. Colo., July 18, 2018).

Another problem with the enhancement is that "[w]hen U.S.S.G. §3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline." James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Ineq. 51 (2010).

As Massachusett's District Court Judge O'Toole explained as a reason for departing under inadequate criminal history per § 4A1.3 when the terrorism enhancement applies:

[T]he automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. *United States v. Mehanna*, No. 09-cr-10017, R. 439, at 69 (D. Mass. April 12, 2012).

In Moyad's case, his advisory guideline range, based on his material support offense and lack of criminal history, is   57 – 71 months.[10] The application of USSG §3A1.4, as recommended by probation, would increase his offense level by 12 and move him from criminal history category I to VI, catapulting his advisory range from 57-71 months to an advisory range of 360 months to Life – an increase in the advisory guideline range of more than 530 percent.

Applying the enhancement and then sentencing Moyad to the statutory maximum would result in the imposition of a sentence comparable to that imposed on far worse offenders. The

---

10 Based on the PSIR computation without the 12 level "terrorism enhancement". [Dkt. 174, Part B]

difficulty in fashioning a just sentence under such circumstances is well recognized. "The experienced and respected district judge here characterized this sentencing as presenting "some of the most difficult and, in many ways, loneliest moments of [his] career."..." *United States v. Thavaraja*, 740 F.3d 253, 259-60 (2nd Cir. 2014) (upholding a 108 month sentence for the chief procurement officer of LTTE, a Sri Lankan entity designated as a terrorist organization.)

Despite the difficulties of such sentencings, circuit courts across the country uphold below guideline sentences in terrorism cases in recognition of the impact of guideline sentences on persons like Moyad who have little or no criminal history and whose crimes did not result in actual injury or destruction. See, Section V, *infra*.

This Court is well within its discretion to sentence Moyad to a term of imprisonment below the sentencing guidelines that incorporate the "terrorism enhancement". Such a sentence would not create an unwarranted disparity with sentences imposed on similar offenders locally or nationally and would constitute a significant punishment that is sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C. §3553a.

## IV.   THE 18 U.S.C. § 3553(a)(1) FACTORS

### A.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

The Dannon family, residents of Fishers, Indiana, are American citizens of Palestinian and Jordanian descent and belong to the Muslim faith.

The family first came to the attention of the FBI following a report in December of 2018 that Modhkear Dannon made a verbal threat to a fellow employee during an argument. Despite Mr. Dannon's denial of the report and no substantiation, the FBI continued its investigation of the family. The investigation continued with the discovery that Mr. Dannon (legally) owned two handguns which he kept in his residence and that he had taken his two oldest sons to shooting

ranges in Marion County. [11]

In early 2018, the FBI focused its attention on Mahde Dannon who had been arrested for multiple offenses in several counties and who had, as a result, become prohibited from possessing firearms. Mahde's jail calls to his father were intercepted and piqued the government's interest in the family. Additionally, when Moyad returned from travelling to Jordan that year, [12] he was subjected – as usual – to a "secondary inspection" by customs officials (CBP). He was "detained" for several hours while CBP searched him, his baggage, his cell phone and conducted an interview of him. As he has done whenever subjected to a "secondary inspection", he cooperated with the interview and the searches and provided the passcode to his cell phone. In 2018, he answered CBP's questions regarding a photograph of himself in (legal) possession of a long gun at a public firing range. [13]

In April of 2018, an FBI confidential source [CHS] met up with Mahde at the kiosk where Mahde was working and discussed purchasing firearms from Mahde, who was then known to the FBI to be a prohibited person. Over the next several months, Mahde sold guns to the CHS which he represented were obtained illegally. In mid-June, the CHS asked Mahde about his brother [Moyad] and inquired as to whether the brother would be interested in "making some money". Mahde represented to the CHS that his brother, Moyad, would be interested in manufacturing ghost guns and, in mid-July of 2018, Mahde gave the CHS an 80% lower receiver

---

11 Indiana has a gun ownership rate of 42.4% and is ranked 21st in the nation in gun ownership. https://wisevoter.com/state-rankings/gun-ownership-by-state/#guns-per-capita-by-state
12 Moyad remained very close to his Jordanian relatives and returned to Amman for visits every few years.
13 Secondary screening of Muslim men and women occurs so frequently that it is referred to as "flying while Muslim" – in reference to "driving while Black" the tongue in cheek commentary on the rate at which African Americans are subjected to traffic stops. https://www.theguardian.com/world/2016/aug/08/the-perils-of-flying-while-muslim; https://thearabweekly.com/how-911-changed-air-travel-muslims-arabs-and-everyone.

which he represented had been obtained by Moyad through mail order. [14]

In late June of 2018, Mahde introduced Moyad to the CHS who, in turn, introduced both brothers to an FBI undercover agent. During the second half of 2018, Moyad and Mahde assembled and sold 8 semi-automatic .223 caliber rifles to the agent. The parts for the rifles were purchased legally online. At the time (pre-2022), it was legal to buy the parts online and assemble the semi-automatic rifles. However, it was illegal to transfer them to another person as they had no serial number and, additionally, it was illegal for Mahde to possess the firearms due to his probationary status and/or pending criminal cases. The agent made no representations to the Dannon brothers regarding the final destination of the guns he purchased from them.

In late 2018, Mahde Dannon initiated a conversation, in Moyad's presence, with the agent regarding the manufacture of fully automatic weapons wherein Mahde offered to assemble fully automatic firearms for the agent. However, the Dannon brothers were incapable of manufacturing the fully automatic weapons because (1) they could not purchase the auto seer, springs and other parts that were necessary to convert a semi-automatic to a fully automatic weapon and (2) they could not mill the lower receiver as they did not have access to the requisite equipment.

In early 2019, the agent (1) provided the Dannon brothers with a fully milled lower receiver and (2) those parts necessary to convert a semi-automatic firearm to an automatic firearm, including the auto seer and springs and (3) provided them with an apartment wherein they could assemble the automatic weapon from the legal parts they purchased and the illegal parts and tools provided by the government. In February, the brothers sold an automatic firearm

---

14 80% lower receivers are completely legal and are not firearms according to ATF definition because the lower receiver cannot be converted to a firearm without being milled out. 80% lowers are common among gun enthusiasts who want to assemble their own firearms and AR-15's are the most common lower built firearm. https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal

which they had assembled to the agent. They assumed that the firearm would be shown to potential buyers other than the agent but did not know who the potential buyers would be.

During the Dannons' discussions with the agent, he represented to them at various times that the buyers would likely be members of a Mexican drug cartel. Moyad did not object to this suggestion. On one occasion, Moyad was taken to a Bloomington restaurant to meet a "prospective buyer" whom he described as "looking like a skinhead and wearing an iron cross". Moyad expressed reluctance to "do business" with this individual and received assurance from the agent that the firearms would be sent overseas and not remain in the U.S. Moyad did not suggest that the firearms could be marketed to a terrorist organization.

In the Spring of 2019, Moyad met the agent in the Southwest to fire the automatic rifle (which the agent transported) and to discuss the sale of the rifle and other rifles yet to be manufactured. While there, the agent introduced Moyad to a second confidential source (CHS 2) – an Arabic speaking man who represented that he had connections in "the Levant" and was a potential buyer of the firearms. [15]

During the trip, Moyad learned that, instead of selling the firearms in Mexico as he had previously been told, CHS2 planned to ship the fully automatic weapons through Mexico to the Middle East and Africa, where they would be used by ISIS. The proposal to ship the firearms to the Middle East and Africa was the government's proposal, not Moyad's.

Specifically, during the meeting near the U.S. southwest border, CHS2 told Moyad that the fully automatic weapons were going to Syria, Iraq, and Libya. The destination for the weapons came from the government, not Moyad, but Moyad did not object. Moyad asked CHS2

---

15 The Levant is the group of countries bordering the eastern Mediterranean Sea, namely Syria, Lebanon, Israel, Palestine, Jordan, and Cyprus (and sometimes, especially in a historical context, including Turkey and Egypt). It is also known as "the core of the Middle East".

what group "his men" belong to and was told that they belong to the "Caliphate of Syria, Iraq, and Libya." In this context, the "Caliphate of Syria, Iraq, and Libya" means ISIS or ISIL. Moyad understood that ISIS or ISIL is a foreign terrorist organization operating in war zones in the Levant.

After returning to Indiana, the Dannon brothers assembled five fully automatic, unserialized rifles which they then sold to the government agents. They assembled the rifles from parts purchased legally online with funds paid them by the government, parts milled by the government and parts provided by the government which could not be legally purchased online, such as the auto seer and springs. They assembled the firearms with tools provided by the government in an Indianapolis office space rented and furnished by the government. They did so after having been told that the firearms would be transported to the Middle East and sold to ISIS, which they knew to be a designated terrorist organization. Moyad did not participate in making any arrangements for the transportation or sale of the firearms, but he did not object.

In addition to the five fully automatic rifles which they assembled, the Dannon brothers, who were then unemployed, agreed to manufacture additional rifles which they hoped to sell to the government agents for up to $10,000.00 each.

B.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT  [16]

Moyad Mohdkear Dannon was born September 29,1997 in Amman, Jordan to the marital



_____
16 Much of the personal history contained in this section was obtained by mitigation investigator Emily Mulder of ARC, Inc. in Baltimore, MD.

14

union of Mohdkear and Nesreen Dannon. Moyad's paternal grandparents were refugees, expelled from the village of Lod in 1948, and relocated to Jordan. [17]. His maternal grandmother was Lebanese and Nesreen's family originally came from Nablus, the commercial and cultural center of Palestine. While a high percentage of Jordanians have Palestinian ancestry, discrimination against Palestinians is common and a quota system limits the number of university admissions for Palestinian youth. [18]

Jordan, which has one of the highest per capita percentage of refugees in the world, [19] is also not uniformly hospitable to refugee families, even second-generation refugees who, like the Dannons, became Jordanian citizens. No members of the Dannon family are historically Jordanian – a fact easily discernable by their Palestinian name, which subjected them to economic and political discrimination in Jordan.

Moyad is the oldest of the Dannons' six children and just eleven months older than his brother Mahde. The boys were inseparable.

  

---

17 Lod underwent a major change in its population in the mid-20th century.[9] Exclusively Palestinian Arab in 1947,[9] Lod was part of the area designated for an Arab state in the United Nations Partition Plan for Palestine; however, in July 1948, the city was occupied by the Israel Defense Forces, and most of its Arab inhabitants were expelled in the 1948 Palestinian expulsion from Lydda and Ramle.[10][11] The city was largely resettled by Jewish immigrants, most of them expelled from Arab countries.
https://en.wikipedia.org/wiki/Lod#:~:text=Exclusively%20Palestinian%20Arab%20in%201947,expulsion%20from%20Lydda%20and%20Ramle
18 https://minorityrights.org/minorities/palestinians-2/#:~:text=After%20the%20outbreak%20of%20conflict,allow%20entry%20to%20Syrian%20refugees.
19 Emanuel James, Discriminatory Nationality Laws in Jordan and Their Effect on Mixed Refugee Families, U. of Notre Dame Law School (2012); internal citations omitted
https://klau.nd.edu/assets/331818/nationalitylawsinjordan.pdf

As a young child, Moyad was raised by his mother, largely in his father's absence. Mohdkear Dannon, who was well educated and trained in the law, was unable to support his young family due to discrimination against him in professional circles. [20] In order to find work, Mr. Dannon traveled, first to Korea and later to the United States, and sent his earnings back to Jordan to support his wife, a homemaker, and his son(s).

In his father's absence, the family lived in an apartment in a crowded neighborhood with a high crime rate. In that environment, Nesreen Dannon was at risk of violence if she worked outside the home. Jordanian law neither encouraged women to work outside the home, nor protected those who did so. [21] This contributed to lower family incomes and greater isolation of women and women-headed households. Violence against women was common in Jordan [22] and, as a result, the Dannon family was isolated during the months that Mr. Dannon was away. During the years they lived in Amman, Moyad's family was the target of multiple burglaries and unlawful entries into their apartment. Moyad was afraid to sleep at night and, even as a very young child, was worried about his mother's safety. This was a valid concern as she was assaulted in their home by an intruder on at least one occasion.

When he ventured out into the neighborhood, Moyad was the target of bullying by neighborhood children. He attributes this to his small stature and his studious nature. He became fearful of playing outside which, in turn, contributed to his isolation and, inevitably, to depression. The family's main connections were with their relatives and Moyad grew up with

---

20 https://www.migrationpolicy.org/article/jordan-refugee-haven
21 As recently as 2021, women only formed 15% of the Jordanian workforce. World Bank Gender Assessment 2021.
22 As recently as 2020, violence against women is still a major problem in Jordan, with domestic violence, sexual harassment, and honor killings prevalent in some communities. Efforts to address this issue have been hampered by a lack of legal protections and a culture of impunity for perpetrators. Mayell, Hillary (12 February 2002). "Thousands of Women Killed for Family "Honor"". *National Geographic Society*. p. 1

aunts, uncles and cousins as his primary support system. He described his lifestyle there as "always being in community with others" -members of his own family.

Mr. Dannon struggled to earn money to support his growing family. Education was extremely important to him and he wanted his boys to attend a private school in Jordan as the



public schools were inadequate. Moyad was able to begin school early and he was a bright child who excelled in reading and language and loved history. As a result of his father's employment overseas, Moyad was able to attend al-Hijaz [23] and al-Tarrbiyya al-Islamiyya [24], private academies in Amman, where he excelled in his studies. Despite his love of learning, Moyad remained isolated from other children, spending most of his non-school time within the family's apartment and among members of the extended family.

Although Mr. Dannon had traveled extensively for his work in the Middle East and Asia, as well as in the U.S., he chose to raise his family in the United States. Moyad's father became a naturalized American citizen around 2002 and Moyad gained his U.S. citizenship, as the minor child of a naturalized citizen, at the same time. The family visited the United States several times when the boys were still young.




---

23 A private international school for boys.
24 A private secondary school for boys.

17

When he was 12, Moyad's family moved from Amman to Summit, Illinois, a densely populated and ethnically diverse suburb of Chicago, which had a reputation of having a good public school system. In Illinois, the Dannon family was lower-middle class. While they had owned their own flat in Amman, since arriving in the U.S., they have only been able to rent housing. Mr. Dannon took many different jobs, frequently more than one job at a time, to support his family. Despite his educational background, he sold cars, drove delivery trucks and sold ice cream. Nesreen Dannon spoke no English and, due to the fact that she was a homemaker and reluctant to leave the home in a strange community, she did not learn English, nor did she integrate into the community.

With the move to the U.S., Moyad was separated for the first time from his extended family. While life in Amman had been difficult, he loved Jordan and still speaks of visiting the Dead Sea and the ruins at Petra and of his strong connection to the desert at Wadi Ram.

Moyad spoke no English [25] when he entered Wilkins Junior High School and he was placed in an ESL class. Moyad recalls being bullied and ostracized in school because he was small, looked and dressed differently from the other children and spoke broken English. He became increasingly quiet and isolated and made few friends, especially as he spent much time in his home helping his mother with the growing family. Over the years, he began to make a few good friends and especially enjoyed played baseball in the park. He was beginning to develop close relationships with other boys his age while attending Argo High School in Summit. They frequented an area in Chicago's south side known for its historic neighborhoods and ethnic diversity, including a Middle Eastern population, restaurants and mosques. An avid swimmer, Moyad joined the water polo team during his freshman year. However, the family moved again

---

25 Moyad had studied English in Jordan and was able to understand some English but spoke very little.

18

before Moyad graduated from high school and, once again, his friendships were disrupted.

The Dannons were discouraged by the high cost of living and the crime rates near Chicago and decided to move to Fishers, Indiana, to a more rural and affordable area. Once again, he was forced to leave a school and friends just as he was finding his place and developing relationships. Also, the family moved during Moyad's senior year, disrupting the senior activities he might otherwise have participated in. He graduated from Fishers High School in 2014.

After graduating, Moyad considered moving back to Jordan to rejoin his extended family. However, he knew that job opportunities would be limited there and was aware that many of his cousins earned degrees but were still unable to find work in their chosen fields in Jordan. Moyad missed the family – he had never been outgoing and never made friends easily– and had considered his brothers and his Jordanian cousins his closest friends. Unlike many of his high school friends in the U.S., he did not drink or use drugs, did not date [26] and rarely socialized outside his family.

When he was not working, Mr. Dannon spent time with his boys. He took the two oldest boys, Moyad and Mahde, to licensed gun ranges where they learned to handle firearms and enjoyed shooting. [27 ]

Moyad got his first job at a Burger King at age 16. Since then, he has only held minimum wage jobs, but was still able to pay the expenses of his classes and his commute by alternately working as a pizza delivery driver, a detailer at a Chevrolet dealership and a clerk at Mecca, a Middle Eastern grocery store.

_____

26 In keeping with tradition, Moyad expects that his family will eventually introduce him to a woman who shares his faith, although he will make his own decision regarding marriage.

27 Recreational shooting is a popular sport in Indiana with DNR sites and private ranges open to the public across the state.  As of 2023, approximately 44.8%. of Indiana families had at least one firearm in the home. https://worldpopulationreview.com/state-rankings/gun-ownership-by-state.

In 2016, Moyad had his first and only arrest. Together with several high school friends, he went to Castleton Mall, where the group was browsing in the sportswear section of a men's store. One of Moyad's friends removed the sales tag from a hat which was identical to the one Moyad wore into the store and placed it on Moyad's head. Moyad wore the new hat out of the store and was arrested, and ultimately convicted, of shoplifting. Moyad insisted that he never had the intention to steal the hat but lost that argument and an appeal. He served a brief period of probation without incident or violation. [28]

Moyad is an intelligent individual and has always sought out challenges. While he enjoyed working on car engines with his father, he wanted a more complicated and challenging profession. He wanted the kind of job that would enable him to support a family of his own as he would not consider marriage unless he was able to fully support a wife. He initially wanted to be a pilot but realized that he could not afford either the tuition or the requisite flight hours. He settled on aviation mechanics, enrolled in the Aviation Institute of Maintenance to pursue a degree in the Aviation Maintenance Technical Engineer Program. Because of his limited finances, Moyad lived at home and commuted to school – approximately 90 minutes each way. Nevertheless, he had perfect attendance. Moyad loved his classes, excelled in his studies and was on the Honor Roll and the Director's List.



In May of 2017, Moyad graduated from the program *cum laude*. [Documents collected at Ex. B] Even after completing the basic program, Moyad returned to take additional classes in avionics. His greatest enjoyment

---

was flying a Cessna with one of his instructors who invited him along and paid for the fuel. After graduating, Moyad had to take additional tests for employment. He failed to take one of the tests, re-testing was an expensive prospect and he could not afford it. This was very discouraging as Moyad realized that he was not making enough money either to achieve his goals or to help his family.

Moyad is a devout Muslim. He sees Islam as a faith that values personal discipline and organization. He prays regularly, reads the text of the Koran, fasts, tries to observe the tenets of his religion and reminds his family to do so, despite residing in a predominantly non-Muslim community. For example, he convinced his father to stop smoking, not only for his own health, but also because smoking violates Islamic teaching. As the oldest son in the family, Moyad also saw himself as a caretaker within the family and, therefore, his inability to find suitable employment and contribute financially to the family felt like a failure. All of these factors increased his depression and, in turn, made it even harder for him to leave home and search for employment.

It was during the year following his graduation, when Moyad was out of school, unemployed and questioning his own self-worth that he became involved in the offense behavior.

C.   THE 18 U.S.C. § 3553(a)(2)(A), (B), (C) and (D) FACTORS.

1.   *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. §3553(a)(2)(A).*

2.   *To afford adequate deterrence to criminal conduct. §3553(a)(2)(B).*

Moyad was arrested immediately upon completion of his [and his brother's] assembly of multiple automatic firearms. His arrest was well publicized locally and nationally. His arrest was followed by immediate detention and he has remained in detention for more than four years with

21

the prospect of further incarceration.

　　　　Research consistently shows that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." [29] "Three National Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence." [30] The Department of Justice too recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment." [31] What this means is that the real fear of being caught, the shame of admitting guilt, and the social stigma of prosecution, are all the preventative aspects of deterrence –not what happens to a stranger who is caught and subsequently punished. [32]

　　　　3.　　*To protect the public from further crimes of the defendant. § 3553(a)(2)(C).*

　　　Prior to the commission of the instant offense, Moyad had led a largely law-abiding life. He had sustained one misdemeanor conviction at the age of 18 when he was arrested for conversion [shoplifting] after entering a store at Castleton Mall with three other boys, one of whom picked up a cap identical to the one Moyad was wearing, pulled off the price tag and handed it to Moyad, who replaced the older cap he was wearing when he entered the store. [33] In that case, Moyad did not resist arrest and was cooperative with authorities. He was placed on unsupervised probation with conditions, which he completed without incident. Other than the misdemeanor, Moyad had no other arrests and no juvenile adjudications or citations.

---

29 Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006).
30  Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").
31 NAT'L INSTITUTE OF JUSTICE, Five Things About Deterrence (Jun. 5, 2016), available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence (as of 12/8/23)
32 Valerie Wright, Ph.D: Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, THE SENTENCING PROJECT (Nov. 2010).
33 This description of the offense differs from that in the PSIR [Dkt. 174 ¶ 41], but is taken directly from the recitation of facts in the Opinion of the Indiana Court of Appeals based on an evidentiary video. 49A05-1709-CR-2030 (4/2/18)

At the time of his arrest in this case, he neither resisted nor was belligerent with authorities.

Moyad has now been incarcerated for four and one-half years under onerous conditions. His arrest and prosecution has been both sobering and humbling for him. He realizes that he has de-railed his professional aspirations, disappointed his extended family and failed to meet his own expectations. He has expressed his sincere remorse to his family and will do so again publicly in his allocution to the Court.

Moyad expects that he will be sentenced to a further term of incarceration and will serve that term in the Bureau of Prisons. During that time, he will be further separated from his family. Upon release, he will serve a period of supervised release and will be subject to the supervision of U.S. Probation and special terms and conditions referenced in the PSIR. He will cooperate with those restrictions as he did with the terms and conditions of Marion County's probation.

Statistically, the greatest determinants of recidivism are age at release and criminal history category. https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview. According to the Sentencing Commission Report of 2016, recidivism rates are lowest for older offenders [those under 21 have the highest rates] and those with the lowest criminal history categories. Likewise, defendants such as Moyad, who have never before been incarcerated, generally require a shorter term of imprisonment to achieve the same goal of protecting the public from further crimes of the defendant. *See United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D.Wisc. June 11, 2005) (Adelman, J.).

Recidivism rates were also lower for college graduates and those with some college. [Moyad is a *cum laude* graduate of the Aviation Technology Engineering Academy]

23

For all of these reasons, Moyad is statistically less likely to reoffend. For the same

reasons, including the imposition of what will be a significant sentence, the seriousness of the

offense will be apparent and Moyad's prosecution, culminating in conviction and a substantial

penalty, will promote respect for the law.

4      *To provide the defendant with needed educational or vocational training, medical
         care, or other correctional treatment in the most effective manner.
         §3553(a)(2)(D)*

The BOP has little to offer Moyad. He is already a high school graduate with a post-

high school degree in Avionics. There are few opportunities for college education other than

correspondence classes for those inmates who can afford to pay the fees themselves.

While Moyad has suffered from gastric problems and lost considerable weight while in

pre-trial detention, he is unlikely to receive care other than an initial medical evaluation. Most

likely, he will self-medicate while in the BOP by enjoying a better diet, buying over the counter

medications from the BOP commissary and having access to clean water and an opportunity to

engage in regular exercise.

One would expect that Moyad would receive counseling to make his recidivism less

likely. However, there are no radicalism-prevention programs within the BOP. In fact, there are

few programs nationally that address the issue of counseling individuals convicted of terrorism.

The District of Minnesota, which has the highest number of terrorism prosecutions, has been a

pioneer in de-radicalization. [34] Chief Judge John Tunheim believes that the program has

already had some success in bringing young defendants back from the brink of radicalization.

The BOP offers little other than incapacitation to offenders like Moyad. Further

education and targeted counseling, which would both further his rehabilitation and lessen the

---

34 https://www.pbs.org/newshour/show/can-reverse-radicalization-counselling

chance of recidivism, could be required as conditions of supervised release.

## V.        IMPOSITION OF A BELOW-GUIDELINES SENTENCE WOULD NOT CREATE AN UNWARRANTED DISPARITY.

Among the factors that 18 U.S. C. 3553 requires that a sentencing court "shall consider" is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". (a)(6). While this admonition has most often been applied to the sentencing of one defendant in a multi-defendant case, it applies equally to similarly situated defendants within a geographical region or, in the case of unusual or statistically rare offenses, to similarly situated defendants nation-wide.

During the past ten fiscal years, the U.S. Sentencing Commission reported that a total of 164 cases had, as their primary sentencing guideline, U.S.S.C. §2M5.3 (Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or For a Terrorist Purpose). There were two cases within the Southern District of Indiana where the primary statute of conviction was 18 U.S.C. §2339B. The sentences imposed were 100 months and 240 months. Within the Seventh Circuit, there were a total of 10 cases with a primary statute of conviction of §2339B, including the two from Indiana. The average sentence imposed was165.6 months. The data base, attached as Exhibit A, is anonymized. [35]

### A.        CO-DEFENDANT DISPARITY IS WARRANTED IN THIS CASE.

Moyad Dannon's sole co-defendant, Mahde Dannon, was sentenced on October 14, 2021 to a twenty (20) year term of imprisonment following his plea to Attempting to Provide Material

---

35 The statistics referenced in this section were compiled by Allison Bruning, Data Analyst with the National Sentencing Resource Counsel of the Federal Public & Community Defenders, from publicly accessible data published by the U.S. Sentencing Commission. The data is set forth in a compilation attached hereto as Exhibit A.

Support or Resources to a Designated Foreign Terrorist Organization as charged in Count 8 of the indictment. Moyad Dannon has also pled guilty to Count 8 and, like Mahde, has done so pursuant to an agreement that provides for the dismissal of the remaining Counts.

Despite the similarity of their plea agreements and the Count to which each brother pled, there are substantial differences between the Dannons' personal histories and their offense behavior.

First, the defendants have radically different prior criminal histories. Whereas Moyad's only contact with law enforcement was a 2016 misdemeanor arrest for shoplifting a baseball cap [36] which resulted in a 6-month probationary term completed without incident [37], Mahde Dannon was awaiting trial on a felony theft case in Lake County [38] and on a felony Criminal Confinement and Battery case in Marion County [39] and had a prior deferral for Criminal Mischief. [40] When he appeared for sentencing, Mahde had two active bench warrants. The government commented on Mahde's priors in its sentencing argument. The Court, in its sentencing colloquy, characterized his pending charges as a "large scale theft of jewelry" in Lake County and "acts of violence" in Marion County and found Mahde's record to be "troubling".

Second, the defendants entered into the criminal activity in radically different ways. According to the government, Mahde Dannon "hatched a scheme" to illegally obtain and deliver firearms, including stolen firearms, to a convicted felon who was an FBI confidential human source. The relationship between Mahde and CHS1 began in April 2018. The government alleged that, between June 2018 and December 2018, Mahde – himself a prohibited person -

36 49G12-1608-CM-031277
37 49G12-1608-CM-031277
38 45G04-1712-F6-000280
39 49D35-1812-F6-043784
40 29D06-1609-CM-007432 (Judgment deferred)

26

obtained and sold approximately 10 firearms – some stolen - and numerous rounds of ammunition to the CHS, knowing him to be a convicted felon.

Mahde brought Moyad into the relationship by introducing him to CHS1 in late July 2018. [41] Thus, Moyad's relationship with the investigation began later and, as a result of, Mahde's suggestion that he assist in the "manufacture" of guns for CHS1. The government does not allege that Moyad participated in the sale of stolen firearms to the CHS.

Third, unlike Mahde, Moyad was not indicted for violations of 18 U.S.C. §§ 922(n) [42] and (d). [43] [Counts 1 and 2] Thus, his Plea Agreement did not include the dismissal of those Counts.

A disparity in sentencing between these co-defendants would be a reasonable response to their differing roles in the offense behavior.

## VI.    CONCLUSION.

For all of the reasons set forth in Section II above, the Court should decline to apply the "terrorism enhancement", calculate Moyad's advisory range without the 12-level enhancement and impose a reasonable sentence within the advisory range.

If the Court applies the 12-level enhancement, based on all of the reasons set forth herein, the Court should impose a sentence of no more than 180 months which would be sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C.§3553a.

Respectfully Submitted,

 /s/ Jessie A. Cook
Jessie A. Cook, #3715-84

---

41 1:19-cr-229, Dkt. 2
42 Transportation of a firearm in interstate commerce by a person under indictment for a felony offense.
43 Transferring a firearm to a person known to be a felon.

Law Office of Jessie A. Cook
3650 North Washington Blvd.
Indianapolis, IN 46205
(812) 232-4634 Office
(812) 239-4575 Cell
jessieacook@icloud.com


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Amended Memorandum was filed

electronically on December 10, 2023.  Notice of this filing will be sent to all parties of record by

operation of the Court's electronic filing system.  Parties may access this filing through the

Court's system.

/s/ Jessie A. Cook
Jessie A. Cook,

28